**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BONNEVILLE POWER ADMINISTRATION,
*Petitioner,*

CITY OF TACOMA; PORT OF SEATTLE;
CORAL POWER, L.L.C.;
CONSTELLATION ENERGY COMMODITIES
GROUP, INC.,
*Intervenors,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
*Respondent,*

PACIFICORP,
*Respondent-Intervenor.*

No. 02-70262

FERC No.
EL00-95-001

12263

ARIZONA ELECTRIC POWER
COOPERATIVE, INC.; DYNEGY POWER
MARKETING, INC.; DUKE ENERGY
NORTH AMERICA, LLC, DUKE ENERGY
TRADING AND MARKETING, LLC,
(COLLECTIVELY, "DUKE ENERGY"); EL
PASO MERCHANT ENERGY L.P.;
METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA; WILLIAMS
ENERGY MARKETING & TRADING
COMPANY; RELIANT ENERGY POWER
GENERATION, INC.,
                             *Petitioners,*

CORAL POWER, L.L.C.,
                             *Intervenor,*

                     v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                             *Respondent.*

No. 03-70185

FERC No.
Power Act

SOUTHERN CALIFORNIA EDISON
COMPANY; CITY OF LOS ANGELES
DEPARTMENT OF WATER AND POWER,
          *Petitioners,*

PORT OF SEATTLE; CITY OF TACOMA;
PEOPLE OF THE STATE OF CALIFORNIA;
CITY OF PASADENA; CITY OF SAN
DIEGO; CA STATE ASSEMBLY,
          *Petitioners-Intervenors,*

          v.

FEDERAL ENERGY REGULATORY
COMMISSION,
          *Respondent.*

No. 02-70294

FERC No.
FERC-EL00-95-
004


SACRAMENTO MUNICIPAL UTILITY
DISTRICT,
          *Petitioner,*

PORT OF SEATTLE; CITY OF TACOMA;
PEOPLE OF THE STATE OF CALIFORNIA;
CITY OF PASADENA; CITY OF SAN
DIEGO; CA STATE ASSEMBLY,
          *Petitioners-Intervenors,*

CITY OF PASADENA, CALIFORNIA,
          *Intevenor,*

          v.

FEDERAL ENERGY REGULATORY
COMMISSION,
          *Respondent.*

No. 02-70274

FERC No.
FERC-EL95-001

AZUSA, BANNING, COLTON, AND
RIVERSIDE, CALIFORNIA,
                    *Petitioner,*

CORAL POWER, L.L.C.;
CONSTELLATION ENERGY COMMODITIES
GROUP, INC.,
                    *Intervenors,*

            v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent,*

PACIFICORP,
        *Respondent-Intervenor.*

No. 02-70270
FERC No.
EL00-95
OPINION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
April 12, 2005—San Diego, California

Filed September 6, 2005

Before: Sidney R. Thomas, M. Margaret McKeown, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Howard Shapiro, Van Ness Feldman, Washington, D.C.; Mark W. Pennak, United States Department of Justice, Appellate Staff, Washington, D.C., for petitioner Public Entities and petitioner-intervenors.

Dennis Lane, Solicitor, Federal Energy Regulatory Commission, Washington, D.C., for respondent Federal Energy Regulatory Commission.

Deborah A. Swanstrom, Patton Boggs, Washington, D.C., for petitioner-intervenor Salt River Project Agricultural Improvement and Power District.

Richard L. Roberts, Steptoe & Johnson, Washington, D.C.; Traci Bone, Public Utilities Commission of the State of California, San Francisco, California, for respondent-intervenor California Parties.

J. Phillip Jordan, Swidler Berlin, Washington, D.C., for respondent-intervenor California Independent System Operator Corp.

## OPINION

McKEOWN, Circuit Judge:

The California energy crisis of 2000 and 2001 is a subject that is well-known to this court and to the public.[1] Following

---

[1]*See California ex rel. Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004); *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004); *In re California Power Exch. Corp.*, 245 F.3d 1110, 1114-16 (9th Cir. 2001).

moves in the mid-1990s to deregulate and restructure the California market, prices soared. In an effort to remedy in part what it termed a "dysfunctional" and "seriously flawed" market, the Federal Energy Regulatory Commission ("FERC" or "Commission") ordered both public and non-public utilities to make refunds.

In this appeal, various non-public utilities—which somewhat confusingly are public, governmental entities, but are not classified by federal statute as public utilities—challenge the refund orders. The utilities take the position that FERC's refund authority extends only to "public utilities" and that the public entities, as governmental bodies, are not "public utilities" and are expressly exempted from FERC's refund jurisdiction. FERC, which is the federal agency charged with regulation of all facilities for transmission and sale of electric energy for resale in interstate commerce, acknowledges that while it does "not have direct regulatory rate authority over power sales by non-public utilities," it has the "authority to order them to abide by the market rules . . . and to make refunds of unjust and unreasonable rates . . . ." 96 FERC ¶ 61,120, at 61,511 (2001). This case boils down to whether FERC's authority to order refunds is based on the identities of the sellers subject to the refund order, i.e., public versus non-public utilities, or on the nature of the transactions, i.e., FERC's broad regulatory authority over the sale of electric energy for resale in interstate commerce.

We conclude that FERC does not have refund authority over wholesale electric energy sales made by governmental entities and non-public utilities. Our resolution of this question flows from a straightforward analysis of the statute, the Federal Power Act ("FPA"). The text is clear and unambiguous. In coming to this conclusion, we are not unmindful of the impact our decision may have on the overall refunds claimed by California ratepayers. But it is not our task to second guess Congress's judgment as to the breadth of FERC's refund

authority. Our role is a limited one—interpreting the statute as Congress wrote it.

The FPA provides FERC certain authority in connection with public utilities as contrasted with non-public utilities and also provides an exemption for governmental entities. Although there is considerable overlap between non-public utilities and governmental entities, the categories are not co-extensive. *See* discussion below in §§ I(A) and (B). The FPA's requirement that all rates for wholesale sales of electric energy must be "just and reasonable"—the basis of the refund orders—applies only to "public utilities" and makes no reference, specific or otherwise, to non-public utilities. FPA § 205 (16 U.S.C. § 824d).[2] Similarly, FERC's authority to investigate rates and to order refunds is limited to any rate collected by "any public utility"; the statute carries no reference to non-public utilities. FPA § 206 (16 U.S.C. § 824e). The FPA also unambiguously states that the provisions of subchapter II, which is the basis of FERC's refund authority, do not apply to governmental entities "unless such provision makes specific reference thereto." FPA § 201(f) (16 U.S.C. § 824(f)). No reference is found in the statute. Consequently, we grant the petition and set aside FERC's orders related to the 2000 and 2001 spot market to the extent the orders subject the governmental entities and non-public utilities to FERC's refund authority under FPA subchapter II.

## FACTUAL AND PROCEDURAL BACKGROUND

The history and legacy of the California energy crisis are long, detailed, and tortured. For purposes of resolving the jurisdictional question before us, however, a lengthy recitation of the background is unnecessary.

---

[2]By convention, the parties and courts tend to refer to the FPA sections instead of the United States Code sections. This opinion will include dual references when each FPA section is referenced for the first time. Each subsequent reference will be to the FPA section only.

In the mid-1990s, California initiated an aggressive market experiment to deregulate and restructure its electric energy markets. The deregulation plan, sometimes referred to as the restructured energy market, called for the creation of two non-profit public benefit corporations, California Independent System Operator ("ISO") and California Power Exchange ("CalPX"). Until it ceased operations, CalPX was the overseer of an auction market for electricity across the California grid and operated subject to FERC tariffs and rate schedules. ISO was responsible for managing the flow of electricity across the grid.

One of the features of the restructured market was the creation of spot markets operated by CalPX and ISO for the wholesale sale of electric energy. The markets, tariffs, and rate schedules of both entities were approved by FERC because the markets involved the "sale of electric energy at wholesale in interstate commerce." FPA § 201(b)(1) (16 U.S.C. § 824(b)(1)).

The spot markets were organized on the basis of a single-price auction in which sellers of electric energy would bid into the market. Those sellers included both public and non-public utilities. In a single-price auction, all of the bidders are paid the same price as was bid by the highest-priced seller whose electric energy was needed to "clear the market" or balance the supply of electric energy against the demand for electric energy. As a result, all of the bidders in a particular hour in the spot market received the same price for their sales.

FERC offered this explanation of how the single-price auction mechanism contributed to high wholesale electricity prices during the California electricity crisis and provided an opportunity for sellers to game the California spot markets:

> In times of adequate supply the single price auction disciplines prices by encouraging suppliers to bid their marginal costs so that they can be selected for

dispatch and be paid the clearing price. However, in times of scarcity the single price auction can exacerbate the effect of supply shortages by allowing sellers who have small market shares to set the clearing price. Not only is the seller transformed into a price setter rather than a price taker, but the resulting price is ascribed to the entire market.

93 FERC ¶ 61,121, at 61,365 (2000).

The petitioners[3] in this case are public entities (cities, counties, irrigation districts, states, and a federal agency) (collectively, "Public Entities") that participated in the ISO/CalPX spot markets as sellers of electric energy. Each entity received the single price for its electric energy sales regardless of whether it was the last and highest bid that cleared the market. According to FERC, these public entities accounted for nearly 30% of the electric energy and ancillary services sales in the ISO and CalPX spot markets during the 2000-2001 period.

On August 23, 2000, FERC initiated an investigation in response to a complaint filed by San Diego Gas & Electric ("SDG&E") which claimed that the ISO/CalPX electric energy markets were producing unjust and unreasonable prices. SDG&E labeled the wholesale markets "dysfunction-

---

[3]The petitioners are the Bonneville Power Administration ("BPA"); Cities of Anaheim, Azusa, Banning, Colton, and Riverside, California ("Southern Cities"); Sacramento Municipal Utility District ("SMUD"); City of Los Angeles Department of Water and Power ("LADWP"); and Arizona Electric Power Cooperative, Inc. ("AEPCO"); the petitioner-intervenors are the Cities of Burbank, Palo Alto, Pasadena, Redding, and Santa Clara, California; Imperial, Modesto and Turlock Irrigation Districts; State Water Contractors/The Metropolitan Water District of Southern California ("SWC/MWD"); M-S-R Public Power Agency; Northern California Power Agency; and Transmission Agency of Northern California. Except for three entities, the Public Entities engage in wholesale and retail generation, transmission, distribution, purchase and/or sale of electric power and energy in California. BPA, SWC/MWD, and AEPCO do not participate in the retail market.

al" and noted that beginning in June 2000, wholesale electric prices at times exceeded, often by a multiple of three or four, price levels at comparable load levels in prior years. In August, FERC ordered a hearing "concerning the justness and reasonableness of the rates, charges, and practices of public utility sellers of wholesale power into the California" markets. 92 FERC ¶ 61,172, at 61,603 (2000). The order contained no reference to governmental entities/non-public utilities. *Id.*

Following the August 2000 Order, FERC initiated an investigation. In a November 1, 2000 Order, FERC found that the California market structure and rates were seriously "flawed" and proposed fundamental modifications to the wholesale market. 93 FERC ¶ 61,121, at 61,370 (2000). The Order included proposed price mitigation measures and refund liability of public utility sellers. *Id.*

Just six weeks later, in a December 15, 2000 Order, FERC terminated the CalPX wholesale rate schedule, outlined a complex web of mitigation measures, and conceded "[t]here [a]re [n]o [e]asy [a]nswers." 93 FERC ¶ 61,294, at 61,997 (2000). Specifically, the Commission proposed to limit the single-price auction by refunding prices in excess of a "breakpoint" price. *Id.* at 61,983.

To implement the "breakpoint" price, on March 9, 2001, FERC established for public utilities a "just and reasonable 'rate screen' above which refunds will either be required or further investigation will be undertaken." 94 FERC ¶ 61,245, at 61,862 (2001). The Commission order was directed to "public utility sellers" and, referencing "non-public utility sellers," the Commission stated that it "has no authority to order such sellers to make refunds." *Id.* at 61,864. A follow-up order on June 19, 2001, expanded the mitigation plan and directed "public utility sellers and buyers" to participate in settlement discussions. 95 FERC ¶ 61,418, at 62,570 (2001).

The first order critical to this appeal came on July 25, 2001, when FERC made "clear that transactions subject to refund

are limited to spot transactions in the organized markets operated by the ISO and CalPX during the period October 2, 2000, through June 20, 2001, and include sales by public and *non-public utilities* into these markets." 96 FERC ¶ 61,120, at 61,499 (2001) (emphasis added).

In discussing jurisdiction over non-public utilities, FERC noted that "non-public utility sellers . . . are not subject to our direct jurisdiction under FPA section 206." *Id.* at 61,511-12. But FERC went on to conclude:

> Under the specific circumstances presented, . . . such jurisdiction may properly be asserted over non-public utility sellers of energy. Under the single price auction mechanism that operated in the centralized ISO and [CalPX] spot markets, all sellers agreed to accept the same clearing price for any given sale. . . . [A]ll sellers into those markets were on notice that those clearing prices, and the market rules that set the clearing prices, were subject to change if they were found to be unjust and unreasonable.

*Id.* at 61,512.

FERC admitted that its decision to order refunds from the Public Entities could be perceived as a change in FERC policy:

> While the Commission in other orders and in other contexts has stated that it does not have jurisdiction over non-public utilities under sections 205 and 206 of the FPA, we have re-examined our authority in the particular circumstances presented here: a centralized single clearing price auction that sets wholesale prices for both public utilities and non-public utilities, pursuant to market rules set by this Commission and administered by public utilities subject

to this Commission's jurisdiction (the California ISO and [CalPX]).

*Id.* at 61,511 n.53. The two dissenting FERC commissioners were a bit more blunt: "The refund rules of section 206 of the Federal Power Act are rather specific. If Congress had wanted the Commission to have refund authority over non-public utilities, Congress would have surely so specified. The breathtaking conclusion that this agency has the power to tell non-public utilities to pay money back will come as a shock to most observers." *Id.* at 61,523.

The Public Entities, along with other non-public utility sellers, sought rehearing on FERC's refund orders. FERC reiterated its finding that "all sellers, including governmental entities" agreed to accept FERC's single price auction mechanism and are "subject to, FERC jurisdiction regarding the rates to be received for those sales, including FERC rate and refund orders." 97 FERC ¶ 61,275, at 62,182-83 (2001). FERC denied that it was invoking the public interest to override jurisdictional limitations thus "doing indirectly that which we cannot do directly." *Id.* In conclusion, FERC stated that "the subject matter of the sales here provides us with jurisdiction." *Id.* One commissioner dissented on this point. *Id.* at 62,260.

## STANDARD OF REVIEW

We review de novo the question of whether an agency has exceeded its statutory mandate. *Am. Rivers v. FERC*, 201 F.3d 1186, 1194 (9th Cir. 2000). The two-step *Chevron* analysis applies to FERC's interpretation of the FPA. *Id.* "[T]he first step under *Chevron* is to ask whether 'the intent of Congress is clear.' " *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 461 (D.C. Cir. 2005) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984)). If Congress's intent is clear, we " 'must give effect to the unambiguously expressed intent of Congress,' regardless of the

interpretation pressed by the Commission." *Id.* (quoting *Chevron*, 467 U.S. at 843). If Congress did not address the "precise question at issue" in this case, "the court does not simply impose its own construction on the statute. . . . Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

## ANALYSIS

### I. THE FPA UNAMBIGUOUSLY EXCLUDES GOVERNMENTAL ENTITIES AND NON-PUBLIC UTILITIES FROM FERC'S REFUND AUTHORITY

We must first consider whether the FPA clearly addresses FERC's authority to order refunds from governmental entities/non-public utilities that sold electric energy in the markets operated by CalPX and ISO. To determine whether Congress spoke directly to the precise question at issue, we apply the traditional tools of statutory interpretation. *See, e.g.*, *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 828-30 (9th Cir. 2002).

The dispute centers on whether the general applicability of the FPA to "the sale of electric energy at wholesale in interstate commerce," contained in § 201(b)(1), overrides more specific FPA provisions that exclude non-public utilities and governmental entities from FERC's authority to enforce just and reasonable rates and to order refunds. *See* §§ 201(f), 205, and 206.

The import of these provisions is clear. Congress was careful to specify which utilities fall within the definition of "public utility." Even though governmental and municipal utilities are public in normal parlance, they are not "public utilities" under the FPA.

FERC derives its refund authority from subchapter II of the FPA, which governs the regulation of electric utility companies engaged in interstate commerce. Two discrete aspects of subchapter II inform our analysis and cabin FERC's authority: 1) section 201(f)'s exemption for governmental entities, and 2) section 201(e)'s definition of "public utility" and the limitation of certain authority to public utilities in sections 205 and 206. With this backdrop in mind, we now examine the role these provisions play in determining the scope of FERC's jurisdiction.

## A.   SECTION 201(f)

[1] Section 201(f) of the FPA provides that governmental entities are not subject to the provisions of subchapter II of the FPA unless specifically stated in the relevant provision:

> (f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt
>
> No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, *unless such provision makes specific reference thereto*.

FPA § 201(f) (emphasis added).

[2] The sweep of this exemption is huge. Nothing in subchapter II applies to the United States or any state, including any political subdivision, unless the statute makes specific reference to any of these entities. By way of shorthand, this exemption is generally viewed as applicable to "governmental

entities." Each of the utilities here, except AEPCO,[4] falls within the general exclusion. The BPA is an agency of the United States,[5] and the SWC is an instrumentality of the state of California.[6] The remaining utilities are each classified as a "municipality"[7] as defined in § 3(7) of the FPA (16 U.S.C. § 796(7)). A municipality is, of course, a "political subdivision of a State." *See* FPA § 201(f). A search of subchapter II for specific reference to FERC's jurisdiction over governmental entities for refund purposes comes up empty-handed for FERC.

It is also significant that Congress did in fact specify particular provisions of subchapter II as applicable to governmental entities for limited purposes. Sections 210-213 (16 U.S.C. §§ 824i-824l) of the FPA refer to "electric utilities," which are defined as "any person or State agency (including any

---

[4]AEPCO is a non-profit rural electric generation and transmission cooperative that obtained some of its financing through the Rural Utilities Service ("RUS"), and is subject to a RUS mortgage under the federal Rural Electrification Act of 1936. *Sierra Southwest Coop. Servs., Inc.*, 95 FERC ¶ 61,310, at 62,057 (2001). We agree with the D.C. Circuit's conclusion in *City of Paris v. Fed. Power Comm'n*, 399 F.2d 983, 986 (D.C. Cir. 1968), that Rural Electrification Administration (now RUS)-financed cooperatives are not government instrumentalities for the purposes of § 201(f) because "[t]hey are neither operated nor controlled by any government, federal, state or local."

[5]16 U.S.C. § 832a(a). The BPA is a federal agency within the Department of Energy and a government seller of power whose rates are regulated by the Northwest Power Act, 16 U.S.C. §§ 839-839g—not the FPA. Because BPA falls within § 201(f)'s exemption of all governmental entities, we need not address BPA's additional arguments regarding its status under the Northwest Power Act.

[6]*See* www.publicaffairs.water.ca.gov/swp/contractors_intro.cfm (last visited July 5, 2005). Further, the SWC does not fall within the definition of a public utility because it does not own or operate facilities subject to the jurisdiction of FERC.

[7]A "municipality" is defined as "a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power."

municipality) which sells electric energy." FPA § 3(22) (16 U.S.C. § 796(22)). As elaborated below, this definition is broader in scope than the definition of "public utility." *See* FPA § 201(e) (16 U.S.C. § 824(e)). Congress was mindful, however, to establish that the regulatory authority over governmental entities contained in these provisions of the FPA should not be construed to subject such electric utilities to the general jurisdiction of FERC:

> The provisions of sections [210, 211 and 212] shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order of the Commission under the provisions of section [210 or 211], *shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.*

FPA § 201(b)(2) (16 U.SC. § 824(b)(2)) (emphasis added).

When Congress wanted a provision of FPA subchapter II to apply to governmental entities, it knew how to so specify. To its credit, FERC does not try to duck the clear import of the statutory requirement; rather, FERC argues that we should ignore the identity of the sellers and look instead to the subject matter—FERC's broad powers over wholesale sales of electric energy under FPA § 201(b)(1), which states that the FPA applies to "the sale of electric energy at wholesale in interstate commerce." This argument ignores a basic principle of statutory construction, namely that the specific prevails over the general. *See Santiago Salgado v. Garcia*, 384 F.3d 769, 774 (9th Cir. 2004) (holding a specific statutory provision will control a general one). FERC's approach could also render a nullity multiple provisions of the FPA. For example,

§ 201(f) would be unnecessary. If FERC could invoke plenary jurisdiction over "the sale of electric energy," then Congress could have saved time and ink by not bothering to narrow that jurisdiction. And § 201(b)(2), which makes clear that FERC does not have broad jurisdiction over electric utilities, would have been superfluous.

## B.   SECTIONS 205 AND 206

[3] The second limitation on FERC's jurisdiction stems from the definition of "public utility" and the unambiguous dictate of §§ 205 and 206 that those sections apply only to public utilities.

[4] Before looking at the scope of FERC's refund authority, it is important first to identify the statutory provision in subchapter II that defines "public utility."

> The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title).

FPA § 201(e) (16 U.S.C. § 824(e)). The FPA's definition of "person" does not include municipalities or state agencies. "Person" means an "individual or a corporation," FPA § 3(4) (16 U.S.C. § 796(4)), and the definition of "corporation" specifically excludes "municipalities," FPA § 3(3) (16 U.S.C. § 796(3)). As noted earlier, "municipality" includes cities, counties, irrigation and drainage districts, and other state agencies and subdivisions that are in the power business. FPA § 3(7). Under these definitions, none of the municipal/state Public Entities is categorized as a "public utility" because they are not individuals and because municipalities and state agencies are specifically excluded from the definition of cor-

poration. We have no reason to consider BPA's status under these provisions as there is no question that it is exempt as an agency of the United States under § 201(f).

We diverge for a moment to consider the status of AEPCO, which requires a more detailed analysis of its classification as a non-public utility. Pursuant to *Dairyland Power Coop.*, 37 FPC 12 (1967), FERC does not consider AEPCO to be a "public utility" within the Commission's FPA jurisdiction. *See Sierra Southwest Coop. Servs.*, 95 FERC ¶ 61,310, at 62,057 n.7 (2001) (explaining that AEPCO, a RUS-financed cooperative, is not a public utility under the FPA). Based on *Dairyland* and *Sierra Southwest*, AEPCO appears to fall outside FERC's § 206(b) refund authority because it is not a public utility and § 206(b) refers only to public utilities.

Nonetheless, FERC urges us to hold that AEPCO is a public utility. FERC relies on equivocal language in a D.C. Circuit decision that suggested some RUS-financed cooperatives could be considered public utilities. In deferring to FERC's conclusion in *Dairyland* that RUS-financed cooperatives generally are not public utilities, the D.C. Circuit stated in a footnote that

> [i]f the Commission had found that conditions in the power industry had so changed that generating cooperatives now did fall within its jurisdiction, this court would be faced with a different issue. For just as the Commission's determination here that it is without jurisdiction is entitled to judicial deference, so would be its determination that it had the requisite authority.

*Salt River Project Agric. Improvement and Power Dist. v. Fed. Power Comm.*, 391 F.2d 470, 474 n.8 (D.C. Cir. 1968) (internal citation omitted). The D.C. Circuit noted that RUS-financed cooperatives "do seem to fall within the ambit of the [FPA's] central phrase, 'public utilities,' " *id.* at 474, but

agreed with FERC that the legislative history surrounding the FPA and Rural Electrification Act permitted it to defer to FERC's conclusion that Congress did not intend to regulate cooperatives through the FPA as public utilities. *Id.* at 475-77.

FERC has, until its appellate brief in this proceeding, treated AEPCO as a non-public utility. FERC has offered nothing in the record to support its change of position nor did its refund orders single out AEPCO for treatment as a public utility. We cannot accept FERC's post-hoc rationalization for ordering refunds from AEPCO.[8] Consequently, in this proceeding we treat AEPCO as a non-public utility but without prejudice to reclassification by FERC in a different proceeding.

**[5]** FERC's rate jurisdiction under § 205 and its refund jurisdiction under § 206 expressly apply only to public utilities, again reinforcing the definitional and scope provisions of the statutory scheme. For example, § 205's requirement that all rates for sales of electric energy must be "just and reasonable" applies only to public utilities and includes no specific reference to governmental entities as would be required to escape the broad exemption in § 201(f). FPA § 205(a) (16 U.S.C. § 824d(a)) ("All rates and charges made, demanded, or received by *any public utility* for or in connection with the

---

[8]FERC's orders during the California energy crisis specifically treated AEPCO as a non-public utility equivalent to a governmental entity. 99 FERC ¶ 61,160, at 61,660 n.62 (2002) ("AEPCO also asked for clarification that, for purposes of the December 19 order, RUS-financed cooperatives receive the same treatment as 'governmental entities.' The December 19 order was sufficiently clear that discussions regarding governmental entities include non-public utilities such as RUS-financed cooperatives."). A February 2005 FERC order held that "Central Iowa is a Rural Utility Service (RUS)-financed electric cooperative and, thus, is not a Commission-regulated 'public utility' under the FPA." *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 110 FERC ¶ 61,093 (2005). Long after its orders in the California refund cases, FERC continued to treat RUS-financed cooperatives as non-public utilities.

transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." (emphasis added)).

**[6]** Notably, FERC's authority under §§ 206(a) and (b) to investigate rates and to order refunds for unjust and unreasonable rates is limited to "any rate, charge, or classification, demanded, observed, charged, or collected by *any public utility* for any transmission or sale subject to the jurisdiction of the Commission"; again, no specific reference is made to governmental entities or non-public utilities. FPA § 206(a) (16 U.S.C. § 824e(a)) (emphasis added); *see also* FPA § 206(b) (16 U.S.C. § 824e(b)) ("At the conclusion of any proceeding under this section, the Commission *may order the public utility to make refunds* of any amounts paid, . . . in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, . . . ." (emphasis added)).

Again, FERC attempts to counter the clear language of the FPA by shifting the analysis away from the identity of the sellers, and focusing instead on the nature of their transactions and the markets and tariffs under which these transactions were conducted. FERC acknowledged in its July 25, 2001 Order that "we do not have direct regulatory rate authority over power sales by non-public utilities," 96 FERC ¶ 61,120, at 61,511 (2001), but concluded that it could still reach the sales of the Public Entities. FERC emphasizes that ISO and CalPX were public utilities that operated FERC-jurisdictional wholesale electricity markets and had FERC-approved tariffs and that the sales in the ISO and PX markets, whether by public utilities or governmental entities/non-public utilities, involved wholesale sales of electric energy in interstate commerce that are within FERC's § 201(b)(1) jurisdiction. *Id.* at 61,513 ("[T]he [Public Entities' transactions], wholesale sales of energy in interstate commerce, were governed by FERC-

approved rules and a FERC-jurisdictional ISO and [CalPX]. Those transactions thus fell within FERC's jurisdiction regardless of the jurisdictional nature of the sellers or buyers.").

FERC relies on these observations about the jurisdictional status of the ISO and CalPX and their markets to reach around the limits of § 201(f):

> While [FPA § 201(f)] exempts governmental entities generally from Commission jurisdiction under Part II of the FPA, it does not do so under the specific circumstances here. Here, governmental entities and others sold energy in a centralized, single clearing price auction market under which all sellers received the same price for a given sale, pursuant to market rules set by this Commission and administered by public utilities (the California PX and ISO) subject to this Commission's jurisdiction. The involvement of the PX and ISO, whose roles are central in these California spot markets, along with the nature of the interstate wholesale sales, give us subject matter jurisdiction entirely independent of the jurisdictional nature of the entities selling into the markets at issue. Thus, FPA section 201(f) does not change the analysis or the result in determining whether we have subject matter jurisdiction over the sales at issue.

97 FERC ¶ 61,275, at 62,181-82 (2001).

FERC attempts to deflect our attention away from the fact that it is ordering refunds from the Public Entities by arguing that FERC is simply using its §§ 205 and 206 authority to reset the prices of the single-price auction to a just and reasonable level:

> Our action thus revises the market clearing prices that all market participants previously agreed to

accept for their sales. In this context, we see no reason to treat non-public utility sellers differently, as they are receiving the same price, the just and reasonable market clearing price established pursuant to market rules approved by this Commission, that they expected to obtain for their wholesale sales into the centralized ISO and PX spot markets.

96 FERC ¶ 61,120, at 61,512 (2001); *see also* 97 FERC ¶ 61,275, at 62,182 (2001). ISO similarly tries to cast FERC's orders as resetting the market clearing price under FERC-jurisdictional tariffs and characterizes the refunds by the Public Entities as just a "byproduct" of the resettlement of the ISO and CalPX markets.

The rationale advanced by FERC and ISO is flawed. Perceiving FERC's orders as effecting a reset market clearing price for all spot market sales under the ISO and CalPX tariffs, rather than as an order for refunds under § 206(b), ignores the explicit language of FERC's July 25, 2001 Order:

The Commission has determined that all sellers of energy in the California ISO and PX spot markets should be subject to refund liability for the period beginning October 2, 2000. We have decided to extend refund liability to public and non-public utility sellers based on our review of the controlling law, the involvement of both types of sellers in the California centralized ISO and PX spot markets, and the equities of the situation.

96 FERC ¶ 61,120, at 61,511 (footnote omitted). We cannot conclude that FERC said "refund" but meant resettlement of the market-clearing price.

FERC's order does more than simply reset the market-clearing price for power in the FERC-jurisdictional ISO and CalPX markets. FERC specifically ordered governmental

entities/non-public utilities to pay refunds, an action that lies outside Congress's clearly expressed intent that FERC's § 206 refund authority should apply only to public utilities. In addition, the fact that ISO and CalPX were public utilities is irrelevant because FERC is ordering refunds from the governmental entities/non-public utilities, not ISO or CalPX themselves. Indeed, it would be one thing for FERC to order CalPX and ISO to operate the market in a different fashion or to set a market-clearing price for power on a going-forward basis, but the retroactive imposition of a market price that effects a refund responsibility is a regulatory action that falls outside of FERC's jurisdiction with respect to non-public utilities and governmental entities.

FERC's attempt to order refunds based on its *general* jurisdiction over wholesale sales of electric energy in interstate commerce contained in § 201(b)(1) contravenes the more *specific* provisions of the FPA that limit FERC's authority over governmental entities, *see* § 201(f), and limit FERC's authority to ensure just and reasonable rates and to order refunds to "public utilities," *see* §§ 205, 206(b). In sum, the text and structure of the FPA are unambiguous: *Chevron* deference is not due where FERC's authority to order refunds under § 206(b) is specifically limited to "public utilities" and no explicit reference to governmental entities is made in § 206(b), as required by § 201(f).

FERC tries to escape the clear dictates of the statute by referring to the FPA's legislative history. This effort is unavailing. Legislative history cannot trump the statute. *See Am. Rivers*, 201 F.3d at 1204 ("[W]e are mindful that this Court steadfastly abides by the principle that 'legislative history—no matter how clear—can't override statutory text.' " (quoting *Hearn v. W. Conference of Teamsters Pension Trust Fund*, 68 F.3d 301, 304 (9th Cir. 1995) (citations omitted); *see also Columbia Gas Transmission Corp.*, 404 F.3d at 461 (noting that we " 'must give effect to the unambiguously expressed intent of Congress,' regardless of the

interpretation pressed by the Commission") (quoting *Chevron*, 467 U.S. at 843).

[7] In any event, FERC's own interpretation of the legislative history in a previous administrative order belies its argument in this case. In a 1998 FERC proceeding, when asked to interpret § 201(f)'s legislative history, FERC concluded that Congress deliberately put governmental entities, such as states and municipalities, outside of FERC's jurisdiction:

> The legislative history of the FPA shows clearly that Congress was deliberate and careful in its efforts not to impose FPA public utility regulation on states and municipalities, even if they transmitted power across state lines. The Senate Report on the bill, for example, stated, "The revision has also removed every encroachment upon the authority of the States," and noted that a new subsection 201(e) [which later became 201(f)] "has been added to remove all doubt that the act is not to apply to public projects, Federal, State, or municipal."

*New West Energy Corp.*, 83 FERC ¶ 61,004, at 61,018 (1998) (footnotes omitted) (alteration in original). Although, as FERC now argues,[9] the motivation behind § 201(f) in 1935

---

[9]FERC quotes the following portion of the Senate Report:

> [Subsection (f)] has been added to remove all doubt that the act is not to apply to public projects, Federal, State or municipal. Despite repeated assurances by representatives of the Federal Power Commission that no such authority was intended, the charge was frequently made that the bill as originally introduced authorized the Commission to compel private utilities to establish connection or exchange power with public plants. This new subsection carries out in unmistakeable terms the original intention of the bill in this respect.

S. Rep. No. 74-621, at 19 (1935). Whatever the intention in terms of protecting private utilities, both the statutory language and this paragraph are at odds with FERC's position in this proceeding.

may have been to prevent government-owned utilities from gaining a competitive advantage over private utilities, Congress unambiguously removed government-owned utilities from FERC's refund jurisdiction.[10]

## II. FERC's Prior Controlling Interpretation of its Authority Under FPA §§ 205 and 206 Is Consistent with a Plain Reading of the FPA

[8] Although we recognize that the California energy crisis was extraordinary, the fact remains that it does not alter FERC's statutory authority. It should be obvious that FERC cannot invoke a "one-time" rule for this circumstance. FERC's long-standing interpretation of §§ 205 and 206 confirms that governmental entities/non-public utilities lie outside its rate-making and refund authority.

As referenced above, FERC concluded in *New West Energy* that Congress expressed its clear intent through § 201(f) that the FPA was to " 'subject private enterprise alone to regulation by the Federal Power Commission, and not to extend that regulation to government and its instrumentalities.' " 83

---

[10]Although we do not read too much into legislative amendments occurring after the FERC decision in this case became final, we note that in August 2005, Congress passed legislation to amend FERC's § 206 refund authority. The legislation amends § 206 to extend FERC's refund authority to entities described in § 201(f) if the entity makes a voluntary, short-term sale of electricity through an organized market in violation of FERC rules or tariffs. The new authority does not apply to cooperatives or to municipal or Federal utilities that sell less than 8 million MWh of electricity per year. Energy Policy Act of 2005, Pub. L. No. 109-___, § 1286, ___ Stat. ___, ___ (2005); *see also* S. Rep. No. 109-78, at 52 (2005); 151 Cong. Rec. H6969 (daily ed. July 28, 2005) (statement of Rep. Barton, Conference Committee Chairman). This amendment suggests that because existing law did not permit FERC to order refunds from governmental entities, Congress felt the need to create an exemption to § 201(f) and limited that exemption to governmental entities selling large quantities of power. In any event, the adoption of this amendment comports with our interpretation of the FPA.

FERC ¶ 61,004, at 61,018 (1998). New West Energy, a governmental entity, sought § 205 approval from FERC to sell electric energy at market-based rates. FERC refused to exercise its § 205 rate authority over New West Energy, even with New West Energy's consent, because §§ 205 and 206 do not extend FERC's authority to governmental entities:

> The statute is thus clear that Part II of the FPA, which contains Sections 205 and 206, shall not apply to any political subdivision of a state or any corporation wholly owned by a political subdivision of a state, unless the provision makes specific reference thereto. Sections 205 and 206 provide the Commission authority over the rates, terms, and conditions of jurisdictional service by public utilities. Those sections do not make reference to the entities listed in Section 201(f).

*Id.* at 61,015. We see no justification for reading §§ 201(f), 205, and 206 any differently in this case.

In a proceeding even more analogous to this case than *New West Energy*, FERC again emphasized that its § 206 refund authority did not apply to governmental entities/non-public utilities. In *Mid-Continent Area Power Pool*, 89 FERC ¶ 61,135 (1999) ("*MAPP*"), Enron Power Marketing, Inc., sought refunds from both public utility and non-public utility members of a transmission power pool operating under a joint open-access transmission tariff. FERC refused to order refunds from one of the governmental entities that was a member of the power pool:

> [W]e address Nebraska District's request that we clarify that the Commission's refund direction in the April Order does not apply to nonpublic utility members of a power pool. We note that Nebraska District, as a utility owned and operated by the State of Nebraska, is not a public utility under the FPA.

> Therefore, we cannot assert jurisdiction over Nebraska District, and the requirements in our April Order apply only to the public utility members of MAPP (since they are within our jurisdiction).

*Id.* at 61,387 (footnotes omitted).[11]

**[9]** Similar to the situation in the *MAPP* proceedings, here both public utilities and governmental entities/non-public utilities were selling electric energy in the wholesale markets operated by ISO and CalPX. Just as in *MAPP*, FERC's § 206 refund authority extends only to the public utilities selling in the ISO and CalPX wholesale markets. FERC's long-standing interpretation of its authority under § 206 reinforces the clear and unambiguous intent of Congress—governmental entities/non-public utilities lie outside FERC's jurisdiction even when engaged in wholesale sales of electric energy.

---

[11]FERC reiterated its refusal to order refunds under § 206 from the Nebraska District in two subsequent decisions in the *MAPP* case: "The tariffs and agreements on file with us are subject to our jurisdiction. MAPP's jurisdictional public utility members are subject to our jurisdiction, but Nebraska District is not. Therefore, when we ordered MAPP to make refunds we clearly meant MAPP, on behalf of its jurisdictional public utility members." 92 FERC ¶ 61,229, at 61,755 (2000). In another order, FERC stated:

> The Commission clarifies that its prior orders found that MAPP had overcharged transmission customers served under its jurisdictional transmission tariff and that full refunds were owed by MAPP. However, because Nebraska District, although a member of the pool and a party to the Restated Agreement, refused to pay refunds and is not subject to our jurisdiction as a public utility under Sections 205 and 206 of the FPA, we recognized that we cannot enforce the refunds requirement against Nebraska District.

91 FERC ¶ 61,353, at 62,182 (2000).

## III. THE *UNITED DISTRIBUTION COMPANIES* CASE IS NOT APPLICABLE

Other than FERC's own new-found interpretation of its refund authority under § 206, the only significant legal authority the Commission points to is the D.C. Circuit's decision in *United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996) ("*UDC*"), which construed the jurisdictional provisions of the Natural Gas Act. Although this case provides some support for FERC's argument, it is no small matter that it involved a completely different statute, and it falls far short of persuading us of FERC's position.

[10] FERC claims that *UDC* supports its focus on the subject matter of the transactions and the central role of CalPX and ISO in the California markets, rather than the identity of the sellers, as grounds for exercising refund authority. In *UDC*, which involved interpretation of the Natural Gas Act and FERC's gas pipeline regulations, the court upheld FERC's requirement that municipalities must comply with FERC's capacity release regulations when they purchase transportation capacity on a FERC-jurisdictional interstate pipeline and then seek to release, or resell, any unused capacity. 88 F.3d at 1149-50, 1154. The Natural Gas Act includes provisions similar to the FPA that extend FERC's jurisdiction over only "natural-gas companies" and over interstate transportation of natural gas with municipalities typically lying beyond the reach of FERC's jurisdiction. *Id.* at 1153-54. The court concluded, however, that FERC could require municipalities to comply with its capacity release regulations, relying on the subject matter of the transactions and the central role of a jurisdictional pipeline in the capacity transactions:

> FERC may, consistent with the [Natural Gas Act], require municipalities to comply with its capacity release regulations. As we explained above, . . . FERC's transportation jurisdiction extends as a separate matter over capacity release given the involve-

ment of interstate gas *pipelines*. The pipelines' role in capacity release is absolutely central, and the transaction itself controls access to interstate transportation capacity, entirely independent of the jurisdictional nature of the releasing and replacement shippers.

*Id.* at 1154 (footnotes omitted).

[11] The D.C. Circuit's focus on the jurisdictional nature of the subject matter of the transaction—transportation of natural gas in interstate commerce—and the central role of a FERC-jurisdictional pipeline does not translate to the same result here. Significantly, the Natural Gas Act does not include a provision analogous to FPA § 201(f), which exempts governmental entities. Furthermore, *UDC* did not involve the question whether FERC may order refunds from governmental entities. *UDC* therefore does not provide a framework that permits FERC to ignore the clear language of the FPA. The FPA clearly states in § 201(f) that the provisions of subchapter II of the FPA, including FERC's §§ 205 and 206 rate and refund authority, do not apply to governmental entities unless the governmental entities are specifically referenced. Section 206 only gives FERC the authority to order refunds from public utilities.

## IV.   THE PARTIES MAY NOT WAIVE THE LIMITS OF FERC'S STATUTORY AUTHORITY

FERC also attempts to avoid the § 201(f) restrictions on refund authority by employing inapt analogies to civil jurisdiction doctrines. FERC characterizes its § 201(b)(1) authority to regulate wholesale sales of electric energy in interstate commerce as "subject matter jurisdiction," and characterizes the restrictions in § 201(f) as restrictions on its "personal jurisdiction." According to FERC, the Public Entities waived any restriction on FERC's authority to order refunds from the governmental entities/non-public utilities because they volun-

tarily participated in markets that were governed by FERC-approved tariffs and agreements:**12**

> Moreover, governmental entities that made sales in the [CalPX] and ISO spot markets waived any exemption they otherwise may have had from the Commission's personal jurisdiction regarding those sales. Because the markets did not exist prior to FERC authorization and operate according to FERC rules, all those who participated in them reasonably had to recognize the controlling weight of FERC authority. . . . All sellers were on notice that those clearing prices, and the market rules that set the clearing prices, were subject to change and refund if they were found to be unjust and unreasonable.
>
> . . . [T]he subject matter of the sales here provides us with jurisdiction. As a separate matter, by selling in the [CalPX] and ISO spot markets, the governmental entities waived any personal jurisdictional limitations.

97 FERC ¶ 61,275, at 62,182-83 (2001) (footnotes omitted).

**[12]** The fact is that FERC's regulatory authority is bound by statute, and utilities can neither waive that authority to opt in or out of FERC's jurisdiction. FERC's effort to recast its statutory authority as a question of bifurcated subject matter/personal jurisdiction is without statutory support. As the D.C. Circuit observed in a recent decision, FERC cannot exercise jurisdiction or authority unless authorized by statute, regardless of whether the jurisdiction is exercised without objection or even with the consent of the relevant parties. In *Columbia Gas Transmission Corp. v. FERC*, the key question was

---

**12**FERC's waiver argument offers more than a little irony given FERC's consistent position—until the ultimate refund order—that it did not have jurisdiction over governmental entities/non-public utilities.

whether FERC "has jurisdiction to compel compliance with the tariff provision [applying to facilities outside FERC's jurisdiction] solely because the tariff was voluntarily filed by the pipeline, even if FERC would not otherwise have jurisdiction over such [facilities]." 404 F.3d at 461 (internal quotation marks omitted). Because the Natural Gas Act specifically provides that FERC's jurisdiction over the transportation and sale of natural gas "shall not apply . . . to the production or gathering of natural gas," 15 U.S.C. § 717(b), the D.C. Circuit rejected FERC's attempt to regulate Columbia's natural gas gathering facilities based on a FERC-approved tariff containing provisions that applied to gathering facilities. *See* 404 F.3d at 462-63. The court pointed out that

> jurisdiction cannot arise from the absence of objection, or even from affirmative agreement. To the contrary, "as a statutory entity, the Commission cannot acquire jurisdiction merely by agreement of the parties before it." As the Supreme Court has explained, "parties . . . cannot confer jurisdiction; only Congress can." In this case, Congress has clearly declined to do so.

*Id.* at 463 (internal citations omitted). Simply because Columbia included natural gas gathering facilities in a FERC-approved tariff did not give FERC jurisdiction to regulate such facilities in the face of a contrary statutory mandate. Similarly, FERC cannot expand its statutory authority to reach governmental entities/non-public utilities through § 206(b) simply because such entities voluntarily participated in markets approved by FERC that involved FERC-jurisdictional wholesale sales of electric energy in interstate commerce.

FERC's decision in the *New West Energy* proceedings bolsters our rejection of FERC's waiver argument. FERC denied New West Energy's attempt to waive limitations on FERC's so-called "personal jurisdiction" in § 201(f):

[W]e note . . . that an entity that is not a public utility under the FPA cannot volunteer to be one. As we said before with respect to the South Carolina Public Service Authority, which is an authority of the state of South Carolina:

> Moreover, because the Commission is prohibited by statute from regulating directly the activities of nonpublic utilities under Sections 205 and 206, the Authority cannot simply waive this restriction and volunteer to become subject to this Commission's jurisdiction under Section 205 and 206.

Likewise, New West cannot be regulated as a public utility simply because it desires to be so regulated.

*New West Energy Corp.*, 83 FERC ¶ 61,004, at 61,015 (1998) (footnote omitted).[13] We see no distinction between a governmental entity/non-public utility that volunteers to be subject to the Commission's jurisdiction and a governmental entity/non-public utility that voluntarily participates in a FERC-approved market to make wholesale sales of electric energy in interstate commerce.

In a variation on the waiver argument, FERC and intervenor California Parties[14] emphasize that the Public Entities

---

[13]*See also South Carolina Pub. Serv. Auth.*, 75 FERC ¶ 61,209, at 61,696 (1996) (while FERC agreed to "evaluate non-jurisdictional activities to the extent they affect the Commission's jurisdictional responsibilities," FERC emphasized its §§ 205 and 206 rate authority could not apply to South Carolina Public Service Authority as a state agency and the "Authority cannot simply waive this restriction and volunteer to become subject to the Commission's jurisdiction under sections 205 and 206").

[14]The California Parties consist of the California Public Utilities Commission, Pacific Gas & Electric Co., San Diego Gas & Electric Co., Southern California Edison Co., California Electricity Oversight Board, and People of the State of California, *ex rel.* Bill Lockyer, Attorney General.

entered into agreements with ISO and CalPX that obligated them to abide by the ISO and CalPX tariffs. They argue that these agreements made it obvious to the Public Entities that the tariffs setting the prices in the ISO and CalPX markets would be subject to FERC regulation under §§ 205 and 206. All of this is true. But it does not change our conclusion that FERC cannot use § 206(b) to order refunds from governmental entities/non-public utilities, even if the price they received for their electric energy sales was set by the FERC-approved tariff of a public utility.

The focus on the agreements between the Public Entities and ISO and CalPX only serves to demonstrate that the remedy, if any, may rest in a contract claim, not a refund action. Such an approach is not novel, as illustrated by FERC's *MAPP* proceedings and the related cases in federal district and circuit court. MAPP is a power pool that includes both public utility and non-public utility transmission owners. In 1999, FERC concluded that portions of the MAPP tariff violated § 205 and ordered refunds from the MAPP members. 89 FERC ¶ 61,135, at 61,384 (1999). Although the Commission concluded that it could not order refunds from the Nebraska Public Power District ("Nebraska District"), a governmental entity/non-public utility, the Commission suggested that a contract action might provide a remedy for public utility members of MAPP against the Nebraska District: "However, we need not and do not address whether nonpublic utility members of MAPP are nevertheless bound to take or refrain from taking any actions, including providing refunds, under the terms of any agreement." *Id.* at 61,387-88.

Later proceedings in federal court illustrate that although FERC had no authority to order the Nebraska District to pay refunds, a contract action brought by parties to the MAPP agreement could result in the equivalent refund relief from the Nebraska District. *Alliant Energy, Inc. v. Neb. Pub. Power Dist.*, Civ. No. 00-2139 ADM/FLN, 2001 U.S. Dist. LEXIS 17802 (D. Minn. Oct. 18, 2001), *aff'd*, 347 F.3d 1046 (8th

Cir. 2003). The district court held that Nebraska District was contractually liable to pay refunds as a result of FERC's orders that changed MAPP's FERC-jurisdictional tariff and the MAPP agreement:

> The Restated Agreement is a contract to which [Nebraska District] is a signatory. [Nebraska District] is bound by the contract regardless of whether FERC has regulatory authority over [Nebraska District] itself. FERC concluded that certain tariff provisions of Schedule F did not comply with Order 888 and that MAPP must revise the Restated Agreement. Accordingly, [Nebraska District] is contractually obligated to refund the amounts it overcollected under the nullified Schedule F tariff provisions, even if the contract amendments resulted from a FERC order.

2001 U.S. Dist. LEXIS 17802, at *14 (footnote omitted). The Eighth Circuit affirmed, noting, "[w]hen a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body. As a result, we are not enforcing the FERC order; instead, we are enforcing an agreement, which [Nebraska District] freely entered." 347 F.3d at 1050 (internal citation omitted).[15]

   **[13]** At bottom, FERC's waiver argument is an effort to have this court restructure the scope of FERC's statutory authority. In declining to do so, we take no position on remedies available outside of the FPA. We hold that FERC does not have refund jurisdiction under FPA § 206 with respect to

---

[15]*See also W. Sys. Power Pool*, 55 FERC ¶ 61,495, at 62,713 (1991) (stating that any requirements imposed on the power pool, which included both non-public utility and public utility members, applied only to the public utility members, and that while "nonpublic utility members of WSPP may have agreed by contract to be bound by the WSPP Agreement" it was "not a matter for this Commission under the Federal Power Act").

governmental entities and non-public utilities. The petition for review is GRANTED; we remand to FERC for proceedings consistent with this opinion.

**PETITION FOR REVIEW GRANTED.**